UNITED STATES DISTRICT COURT        SOUTHERN DISTRICT OF TEXAS

| | | |
|---|---|---|
| Thomas Turner, § | | |
| § | | |
| Plaintiff, § | | |
| § | | |
| versus § | | Civil Action G-07-185 |
| § | | |
| Suzlon Wind Energy Corp., § | | |
| § | | |
| Defendant. § | | |

## Opinion on Summary Judgment

1.   **Introduction.**

A windmill blade fell on a worker while a crew was moving it at a yard. He has sued the blade manufacturer, saying that one if its employees caused the accident by changing how the blade was supported. The company and the worker have moved for summary judgment on the issue of control of the crew. The company has also said it could not have been negligent because it had no control over the premises. The worker's claim is unrelated to the land; he says that human action caused his injury.

2.   **Background.**

Suzlon Wind Energy Corporation makes windmills abroad and sells them in the United States. In Houston, Suzlon had used Shippers Stevedoring Company exclusively to unload them since 2005. It shipped them from India to the port of Houston, where Shippers would store and then load them on trucks for delivery to Suzlon's construction sites.

In 2006, Suzlon sold blades to a company in Oklahoma. Each blade is 150 feet long and weighs six tons. The end of the blade that is attached to the turbine at the tower is about seven feet in diameter.

Aboard the ship, two blades were in one cage or rack. Suzlon told Shippers that it needed to transport each blade separately on the trucks to comply with Oklahoma law, so they had to be removed from the cages.

Suzlon also needed to glue fins to the blades, creating turbulence to prevent a vacuum at the downwind edge of the blade. Since the fins would go on the leading edge, one blade from each cage would have to be rolled 90 degrees.

Suzlon and Shippers amended their agreement for this project on February 13, 2007. It says: ". . . Suzlon desires to have its employees and subcontractors enter upon Shipper premises . . . to direct and supervise Shippers employees to remove wind generator blades from their racks, clean and wash the blades . . . attach and or remove various parts . . . and reposition the blades on new racks."

Supervisors from Suzlon and Shippers met before the work began on February 20, 2007. They planned how to move the blades.

- Contract welders would cut the cage.
- Shippers would remove the cage's sides with forklifts.
- Shippers would sling the blades to move them to stands on the ground.
- Once in the stands, Shippers would re-sling the blade that had been shipped in the wrong orientation in the cage.
- Shippers would rotate the blade to the correct position needed for Suzlon to attach the fins.
- After the fins were on, Shippers would load the blades onto the trucks with the crane.

Toby Royer was a superintendent for Suzlon who planned the work with three managers from Shippers. Willis Cassidy was Shippers' superintendent on this project. Because of Shippers' union, Royer could not instruct Shippers' workers. Cassidy was told to relay directions from Royer to them.

During the project, blade tips were being damaged by the stands. On February 23, Thomas Turner, a crew chief, was at the thick end of a blade as it was lowered into the stands for re-rigging. Royer was at the tip. Cassidy was somewhere in between them. Shippers' crew members say that Royer told them to get tires off a pallet, cover them with a carpet, and rest the tip on that stack, rather than on the stands that they had been using. They say that when they refused, Royer stacked the tires and carpet himself and signaled to the crane operator to lower the blade. Cassidy said that when he saw Royer using the tires, he asked what he was doing, and that Royer replied that he had seen tires used in the field.

The crane operator lowered the blade onto the tires, and the crew re-slung it. A few moments later, the blade rolled off and fell on Turner, who had been working underneath the blade. The crew lifted the blade with a forklift and pulled Turner from it, severely injured.

3. **Borrowed.**

The longshoremen's compensation act shields employers from tort liability except under it. This immunity extends to an employer of employees who have been borrowed. While many factors may be used to determine whether an employee is borrowed, the central question is simply the degree of control exercised by the employer over the worker in the actual work. **West v. Kerr-McGee Corp.**, 765 F.2d 526, 530-1 (5th Cir. 1985).

Suzlon says that both the contract and Royer's presence are evidence that it controlled Turner, making him a borrowed employee.

First, the formal process was that Royer would only talk to Cassidy, and Cassidy would instruct the crew. Like all work sites, however, the reality varied. On the ground, Royer apparently spoke directly to the crew. The directions Royer may have given were about the details of the turning, not about controlling the entire operation or Shippers' crew. Cassidy, and sometimes another supervisor, were there to countermand him.

Second, this project was a sub-agreement in a two-year business relationship between Suzlon and Shippers. Suzlon hired Shippers to move blades. When the fins were needed, Suzlon brought its own subcontractors to attach them. Attaching the fins was Suzlon's work – moving the blades was Shippers'. Turner's injury occurred while they were moving the blades.

In a similar case, Shell had a contract with an independent welding company for tank repair on its barge. That company sent Ruiz to fix a dent on a metal tank. Shell and the tank-maker, National, orally agreed that a National employee would supervise the repair. While Ruiz was working, a hydraulic jack hit him. He sued National and Shell. National's man testified that he directed Ruiz, but Shell said that Ruiz was still under the control of the welding company's own gang pusher. The court held that Ruiz did not become National's borrowed employee simply because National's man instructed Ruiz on the tank repair. **See Ruiz v. Shell Oil Co.**, 413 F.2d 310 (5th Cir. 1969).

Here, a contract between Suzlon and Shippers did contemplate some control. Suzlon would "direct and supervise Shippers employees to remove wind generator blades from their racks, clean and wash the blades . . . , attach and or remove various parts, and reposition the blades on new racks . . . ."

Saying that a job should be done a certain way, however, is different from controlling individual workers. Royer supplied details for carrying out the operation and worked with Shippers' crew. He directed parts of it, but he did not control it. Even taken as true that Royer got the tires and flagged the crane to lower the blade tip onto them, it does not reach the level of influence necessary to find that Turner became Suzlon's borrowed employee. Royer instructed some, but he did not consistently or pervasively instruct Shipper's crew on its part of the job. Suzlon's suggestions about details of one step of a larger operation do not mean that it became the employer of everyone working on that one step.

4.  **Negligence.**

Turner says that Suzlon was negligent in the way it executed a portion of the work. For Suzlon to be negligent, it would have had to create an unreasonable risk of harm that proximately caused Turner's injury. Turner's version of the facts would establish that: Royer signaled for the blade to be lowered on unstable tires that he had stacked, the blade was too heavy for the tires, and it rolled, and fell on Turner. Suzlon's defense is that it was not in control of the premises.

Suzlon's defense does not apply under these circumstances. These facts only generate a claim that Suzlon conducted the operation in way that was unreasonably dangerous. The land, crane, rigs, and forklifts, were furnished by Shippers. Nothing was wrong with them. Nor was anything wrong with the tires; their use to support the blade was a human error, not a dangerous site. Turner's injury was the result of an operating defect, not a premises defect. Shippers' contribution to this operating defect is also a question of negligence in the operation.

5.  **Conclusion.**

Because Turner was not an employee of Suzlon at the time of his injury, he is not limited to the longshoreman's act. Since Suzlon did not control the shipyard, the portion of its motion on premises liability is granted. Suzlon owed Turner the same duty of care it owed to

third parties – not an elevated duty, a professional duty, or a land-based duty.  Suzlon owed Turner the same plain-vanilla duty of care that a plumber would owe an electrician working at the same house. Turner's motion will be granted in full.

    Signed on June 12, 2009, at Houston, Texas.

Lynn N. Hughes    USDJ
United States District Judge
